BERNARD COLLETTI and ELSA COLLETTI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Colletti v. Commissioner
Docket Nos. 3174-68, 2795-69
United States Tax Court
T.C. Memo 1974-268; 1974 Tax Ct. Memo LEXIS 49; 33 T.C.M. (CCH) 1211; T.C.M. (RIA) 740268; October 15, 1974, Filed. *49 During 1965 petitioner was a regular patron at Yonkers Raceway. The respondent determined that petitioner failed to report his winnings from gambling at the raceway. Held, petitioner has satisfied his burden of proving that he did not receive gambling income as determined by respondent. Jerome Kamerman, for the petitioners. Michael K. Phalin, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: The respondent determined the following deficiencies in petitioners' Federal income tax: Docket No.
Year
Deficiency
Additions to Tax I.R.C. 1954 Sec. 6653(b) 3174-68
1964
$119,551.69
$59,775.85
2795-69
1965
19,220.21
9,610.10
The issues for decision are whether petitioners failed to report $54,032.13 in twin double winnings for 1965 and if so whether petitioners' failure to report any part of their twin double winnings for 1965 was due to fraud on the part of Bernard Colletti. FINDINGS OF FACT Some of the facts have been stipulated are found accordingly. Petitioners are Bernard Colletti (hereinafter referred to as petitioner) and Elsa Colletti, husband and wife, who resided in *50 Scarsdale, New York, at the time of the filing of the petition herein. They filed joint Federal income tax returns for the taxable years 1964 and 1965 with the district director of internal revenue in New York, New York. Petitioners used the cash receipts and disbursements method of reporting their income for 1965. During 1965 petitioner was employed as a salesman and manager in a retail appliance store. In July 1964, petitioner purchased, for $600, a 1/9 interest in a race horse named Sister Susan. In October 1964 he purchased a one-half interest in a race horse named Aqualand. Petitioner subsequently sold his interests in both of these horses. In July 1965 petitioner purchased an interest in a third race horse for $1,250. During 1965 petitioner was a regular patron at Yonkers Raceway (hereinafter referred to as Yonkers), a New York State harness racing track. When at Yonkers, petitioner sat in the horseman's section, which was reserved for horse owners and their friends.While there, he engaged in betting on the results of the harness races in the company of his fellow owners. The most exotic form of pari-mutuel betting authorized at Yonkers during the years in question *51 was known as the twin double. It was introduced at Yonkers in 1963 and terminated at the close of the 1966 season. The twin double was a wagering pool based on the results of the sixth, seventh, eighth and ninth harness races run on a given night. A bettor purchased a two dollar pari-mutuel ticket for the sixth and seventh races containing the numbers of the two horses which he had selected as winners in those races. If the bettor correctly selected the winners of those two races he would have a "live" ticket in his possession at the conclusion of the seventh race. The bettor then returned to the pari-mutuel window and exchanged, without further cost, his "live" ticket for another ticket containing the numbers of the two horses he had selected as winners in the eighth and ninth races. Tickets for the eighth and ninth races could only be obtained in exchange for "live" tickets. If the bettor then correctly selected the winners of the eighth and ninth races he would have a winning twin double ticket in his possession at the conclusion of the ninth race. In order for a winning twin double ticket to be cashed it had to be presented at a verifier's window. The person presenting the *52 winning ticket was required to present some form of acceptable personal identification and personally sign a form prepared by the verifier based on this information. A copy of this form and the winning tickets were then taken and presented at a cashier's window for actual payment in cash or by check. Officials at Yonkers Raceway prepared Internal Revenue Service Forms 1099 based on the information obtained by the verifiers as to each person presenting winning twin double tickets. The original of the Form 1099 was sent to the Internal Revenue Service, and a copy to the person who signed the verifier's form. On their 1965 tax return petitioners reported $6,367.06 of gross income consisting of $6,290 of wages earned by petitioner, $10.76 in interest income, and $66.30 arising from a New York State tax refund. During 1965 Elsa Colletti was a housewife with no income of her own. On their 1965 return petitioners reported $2,327.14 of deductible itemized expenses. During 1965 petitioners had three minor children. During 1965 petitioners owned a late model Buick, which they purchased new, and a house, upon which the mortgage payments were $160 per month. In his statutory notice, *53 respondent has determined that petitioners failed to report on their tax return income of $54,032.13 received during 1965. Respondent also determined that all or part of the underpayment of tax required to be shown on the return for the taxable year ended December 31, 1965, was due to fraud. Respondent has conceded that no deficiency is owed with regard to the year 1964. OPINION The first issue for decision is whether petitioner realized unreported income in the amount of $54,032.13 during 1965. The respondent contends that petitioner received this amount during 1965 through winnings from the twin double betting feature at Yonkers. The petitioner has testified that he owned an interest in a race horse during 1965 and that he attended Yonkers about three times each week during the four to five-month racing season. The petitioner has testified that he placed small bets on the races either by himself or through acquaintances and that as a result of his wagering activities he lost about $500 during the racing season. He has also testified that he cashed winning tickets for himself and for others and that other individuals also cashed some of his winning tickets. The petitioner *54 denied that he won the twin double on any occasion during 1965. The respondent called as a witness Lawrence Strauss (hereinafter referred to as Strauss) who testified that he cashed tickets of various individuals at Yonkers during 1965. Strauss testified that he cashed in excess of 100 twin double tickets having a total value of over $200,000 at Yonkers during March, April and May of 1965. He testified that Colletti was one of three individuals for whom he cashed a significant number of tickets. Strauss stated that for his services he received a percentage of the winnings and that he cashed tickets because he had nothing to fear from a large civil tax assessment since he had no assets that could be levied upon for payment.Although Strauss was able to specifically describe only one instance in which he cashed a ticket for petitioner, he estimated that he turned over at least $50,000 in twin double receipts to petitioner during the three-month period. Strauss has been convicted of robbery, negotiation of fraudulent checks and possession of stolen United States Government property. At the time of the present trial, he was on probation. Strauss had admitted to a court of law *55 that he falsely testified in a previous lawsuit. In the present trial, Strauss testified that he would commit perjury in order to stay out of jail and in order to avoid paying income tax. Strauss also testified that he has not filed income tax returns for the years 1964 through 1969 and that he earned income during some of those years. Although the only evidence presented by petitioner to meet his burden of proof was his own testimony, we believe that such testimony was adequate in the present circumstances. The law imposes much less of a burden on a taxpayer who is called on to prove that he did not receive income than it imposes on a taxpayer who contends he is entitled to a deduction. (C.A. 6, 1960). The only evidence offered by respondent to dispute petitioner's testimony was that of a convicted felon who readily admitted that he had lied during a previous trial and that he would lie again to stay out of jail or to keep from paying taxes. We find the testimony of Strauss to be totally lacking in credibility. Furthermore, we believe that the lifestyle of petitioner is more consistent with petitioner's testimony than *56 with that of Strauss. The record shows that petitioner made mortgage payments of $160 per month on a personal residence during the year in issue and that during 1965 he had purchased a new late model Buick. We believe that such minimal expenditures are inconsistent with respondent's determination that petitioner received over $50,000 in gambling winnings in addition to his regular income. Furthermore, there is no indication in the record that petitioner had placed large sums of money in bank accounts and in investments. Accordingly, we find that petitioner has adequately satisfied his burden of proving that he did not receive income in the amounts determined by respondent. Having determined that petitioner did not receive income in excess of that reported in 1965, we need not decide whether petitioner is liable for the fraud penalty. Decisions will be entered for the petitioners.